BEFORE THE SECOND DIVISION, SEPTEMBER 22, 1959

**No. 63377.**—Gallagher & Ascher *v.* United States, protests 58/11880–10033 and 58/15865–10090 (Chicago).

LAWRENCE, Judge: At the call of the above-enumerated cases for hearing, they were consolidated for purposes of trial and determination.

The question presented is whether certain aluminum ingots, which were classified by the collector of customs as aluminum, in crude form (not including scrap), in paragraph 374 of the Tariff Act of 1930 (19 U.S.C. §1001, par. 374), as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and subjected to duty at the rate of 1.3 cents per pound, should properly have been classified as metal scrap and granted the benefit of free entry, by virtue of Public Law 869 of the 81st Congress, as amended by Public Law 85–27 of the 85th Congress.

For ready reference, we here set forth the pertinent provisions of Public Law 869 of the 81st Congress, as amended—

Sec. 1. (a) No duties or import taxes shall be levied, collected, or payable under the Tariff Act of 1930, as amended, or under section 3425 of the Internal Revenue Code with respect to metal scrap, or relaying and rerolling rails.

(b) The word "scrap", as used in this Act, shall mean all ferrous and nonferrous materials and articles, of which ferrous or nonferrous metal is the component material of chief value, which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured.

In support of plaintiff's contention, Howard W. Shick appeared as a witness. He testified he was associated with William F. Jobbins, Inc., of Aurora, Ill., the ultimate consignee of the merchandise in issue, as a scrap buyer, and had been in the company's employ for 19 years. The business of his employer is the production of specification ingots for customers in the foundry industries.

Shick stated he was familiar with the two importations in question and with the nature and uses of aluminum scrap. He described the importations as consisting of small bars, approximately 18 inches long, 2 inches deep, and 3 to 4 inches wide, and asserted that the merchandise was received in a "dirty gray" oxidized condition. As imported, the ingots were unfit for direct manufacture because of their oxidized appearance, the greater danger accompanying the use of wet ingots, because they would explode on contact with other molten metals and, due to lack of knowledge of the composition of the imported ingots, it would not be possible to guarantee the merchandise for use as specification ingots.

It was the witness' testimony that the imported merchandise was used in the production of specification ingots largely as "a heel for a start-up of a furnace

operation, * * *. In other words, we have an empty furnace to start off; we charge a certain amount of these ingots into the dry furnace, turn the heat on, and melt it up. At that time there is no particular danger of it exploding because it has not entered the molten bath." He stated that the ingots were used in limited quantities and alloyed by remelting with other scrap materials. After being blended with the other metallic elements, put through certain cleaning processes, and poured into ingots, the resulting product was shipped to his customers as specification ingots.

On cross-examination, Shick stated that when the merchandise was received at his company's plant an analysis was made which led to the determination that the instant ingots could not be used in their condition as imported for direct manufacture without being combined with other molten metals in order to produce specification ingots.

As plaintiff's exhibit 1, there was received in evidence an affidavit of B. Vermeer, an employee of Lips N. V. Metaalbedrijf, shipper of the imported merchandise, pertaining to the aluminum ingots covered by entry number 0–948, and as plaintiff's exhibit 2, there was received a similar affidavit of Th. J. van Uffelen, also an employee of Lips N. V. Metaalbedrijf, relating to the ingots covered by entry 0–1205. The essence of said affidavits is that the imported ingots had been produced from scrap material; that the material had been processed into ingots by a blast furnace operation solely for convenience in transportation; and that no virgin or primary metal was used in the production of said ingots.

In support of its contention that the imported ingots are entitled to free entry for dutiable purposes pursuant to Public Law 869, as amended, plaintiff cites the case of *Gallagher & Ascher Company* v. *United States*, 40 Cust. Ct. 499, Abstract 61737, wherein a similar claim for relief on previous importations of aluminum ingots was made and sustained.

From the evidence presented in this case, which stands uncontradicted, it appears that the present importations consisted of scrap metal which was processed into ingot form solely as a convenience in transportation and contained no virgin or primary metal. Said ingots, upon importation, were fit only for remanufacture.

We are of the opinion, therefore, that the imported articles constitute metal scrap within the purview of Public Law 869 of the 81st Congress, as amended, and that they accordingly should be granted the benefit of free entry. The court so holds.

Judgment will issue accordingly.