No. 64128.—Lando Products, Inc., and W. J. Byrnes & Co., Inc. *v.* United States, protest 245759–K (Los Angeles).

Rao, Judge: Plaintiffs, in this action, seek a refund of duties assessed against an importation of aluminum in ingot form at the rate of 2 cents per pound pursuant to the provisions of paragraph 374 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, for aluminum in crude form except scrap. It is here contended that said merchandise consists of aluminum scrap, fit only to be remanufactured, which is entitled to entry without the payment of duty, by virtue of the provisions of Public Law 869, 81st Congress, 2d session, as amended.

The competing provisions to the extent invoked in this action read as follows: Paragraph 374, as modified by T.D. 51802, *supra*:

Aluminum, aluminum scrap, and alloys (except those provided for in paragraph 302, Tariff Act of 1930) in which aluminum is the component material of chief value:
    In crude form (except scrap) _____ 2¢ per lb.

Public Law 869, as amended, *supra*:

Sec. 1. (a) No duties or import taxes shall be levied, collected, or payable under the Tariff Act of 1930, as amended, or under section 3425 of the Internal Revenue Code with respect to metal scrap, or relaying and rerolling rails.

(b) The word "scrap," as used in this Act, shall mean all ferrous and nonferrous materials and articles, of which ferrous or nonferrous metal is the component material of chief value, which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured.

The record in the instant case is composed of the testimony of three witnesses called on behalf of plaintiffs, together with an affidavit, introduced into evidence as plaintiffs' exhibit 1. Insofar as said affidavit is concerned, counsel for plaintiffs proffered it during the course of the testimony of one Marco Padilla, a representative of the office of the collector of customs at the port of Los Angeles, who was called to identify it, with the following statement:

Mr. Glad: I would like to offer this in evidence, not for the truth of the matter stated therein, but to prove that an affidavit was filed to show the condition of the merchandise prior to its importation.

There being no objection on the part of counsel for defendant, the affidavit was marked plaintiffs' exhibit 1. Although plaintiffs later introduced testimony to the effect that the affiant, one Frederick Feil, had died during the month of September 1957, no further effort was made to submit for substantive consideration, the matter therein attested. Accordingly, we deem it appropriate to observe that plaintiffs' exhibit 1 is in evidence for the limited purpose stated by counsel, and any reference to its contents as probative of the material issues in the case is unwarranted and must be disregarded.

Plaintiffs' witness Karl Klenz testified that, for a period of 12 years, he has been the vice president of Lando Products, Inc., a firm engaged in the manufacture of aluminum strip in various forms, especially venetian blind slat material. During the year 1951, at which time it may be assumed negotiations for the purchase of the merchandise at bar were conducted, Klenz' duties for his company covered the procuring of basic supplies, such as aluminum, paint, and wire, and it appears that he supervised the purchase of the subject merchandise.

The witness explained that the aluminum normally consumed by his company in the production of aluminum strips is a heavy gauge hot-rolled sheet product, known as reroll material, usually purchased from either Alcoa, Reynolds, or Kaiser. He stated that, in 1951, aluminum was in short supply and the domestic manufacturers of reroll material set up allotments for its distribution. However, since the manufacturers accepted for credit against increased allowances aluminum in ingot, pig, and other forms, which they, in turn, smelted, Lando Products, Inc., purchased such other forms of aluminum and resold them to the suppliers, together with scrap from its own production.

Klenz defined the term "pig," as used by him and in his industry, as a virgin metal in pig form, and the term "ingot" as referring mainly to a shape. He stated that the dollar credit allowed on pig metal was greater by 25 to 29 cents than that for scrap metal, and that the subject ingots, which were sent to the Vernon works of Alcoa in Los Angeles, were credited as scrap metal.

Ernest J. Saska, also called as a witness on behalf of plaintiffs, testified that, between 1948 and 1954, he was engaged in the import-export business, as a representative of the Argentine Government. He conducted the business under his own name and maintained offices in Buenos Aires, Argentina, Los Angeles, and in Austria. In charge of the Austrian office was the affiant, hereinabove mentioned, Mr. Frederick Feil.

It appears from Saska's testimony that the import phase of his business involved the purchase of aluminum ingots and aluminum wire and that he bought both the virgin metal and scrap material. He stated that, in 1950, there was a price differential of from 5 to 8 cents per pound between the two, the virgin aluminum being the more expensive, and that, to his knowledge, virgin aluminum is used for cold rolling. He had not, however, had any personal experience or knowledge of the uses of scrap material.

He further stated that he ordered the merchandise at bar through his Austrian office and sold it to plaintiff Lando Products, Inc. It was ordered and sold as scrap aluminum.

Counsel for plaintiffs contend that the facts allegedly established in this case are similar to those found in the cases of *Gallagher & Ascher Company* v. *United States*, 40 Cust. Ct. 499, Abstract 61737, and *Gallagher & Ascher* v. *United States*, 43 Cust. Ct. 347, Abstract 63377, wherein aluminum ingots were held to be scrap, fit only to be remanufactured, within the purview of said Public Law 869, and, therefore, that a like conclusion should be reached here.

We are of opinion, however, that resort to the cited cases merely emphasizes the deficiencies of proof in the instant record, which is patently wanting in evidence to support the proposition that the merchandise at bar is scrap aluminum, fit only for remanufacture. The salient facts in each of the cited cases are stated in the respective decisions as follows:

From Abstract 61737, *supra*:

At the trial of this case, two well-qualified witnesses testified for the plaintiff. Their testimony establishes that the subject merchandise consists of aluminum ingots which were obtained by taking scrap aluminum turnings and reducing them in a furnace to ingot form; that these ingots were not made purposely to any kind of specification; that these ingots had no uniformity of quality or analysis; that the turnings had no other use; and that they were reduced to ingot form solely for convenience in transportation and handling, because the cost of shipping in the form of turnings would have been prohibitive.

The evidence also establishes that the subject ingots were used for remanufacturing purposes as part of the mix in the production of specification ingots; that the imported ingots had no other use and were fit for no other use than to be blended with other aluminum scrap to make specification ingots; that these imported ingots were not fit for direct manufacture, because they did not have the required shape or weight for use in rolling mills or extrusion mills or

for castings; that they could not be used for deoxidizing purposes, because they were too large and, in their imported condition, were too dirty, tarnished, and contained moisture, and had no uniformity of analysis; that the imported ingots "were used over a period of time as part of a mix to be melted to produce a specification ingot"; * * *.

From Abstract 63377, *supra*:

Schick stated he was familiar with the two importations in question and with the nature and uses of aluminum scrap. He described the importations as consisting of small bars, approximately 18 inches long, 2 inches deep, and 3 to 4 inches wide, and asserted that the merchandise was received in a "dirty gray" oxidized condition. As imported, the ingots were unfit for direct manufacture because of their oxidized appearance, the greater danger accompanying the use of wet ingots, because they would explode on contact with other molten metals and, due to lack of knowledge of the composition of the imported ingots, it would not be possible to guarantee the merchandise for use as specification ingots.

It was the witness' testimony that the imported merchandise was used in the production of specification ingots largely as "a heel for a start-up of a furnace operation, * * *. In other words, we have an empty furnace to start off; we charge a certain amount of these ingots into the dry furnace, turn the heat on, and melt it up. At that time there is no particular danger of it exploding because it has not entered the molten bath." He stated that the ingots were used in limited quantities and alloyed by remelting with other scrap materials. After being blended with the other metallic elements, put through certain cleaning processes, and poured into ingots, the resulting product was shipped to his customers as specification ingots.

On cross-examination, Schick stated that when the merchandise was received at his company's plant an analysis was made which led to the determination that the instant ingots could not be used in their condition as imported for direct manufacture without being combined with other molten metals in order to produce specification ingots.

As plaintiff's exhibit 1, there was received in evidence an affidavit of B. Vermeer, an employee of Lips N. V. Metaalbedrijf, shipper of the imported merchandise, pertaining to the aluminum ingots covered by entry number 0–948, and as plaintiff's exhibit 2, there was received a similar affidavit of Th. J. van Uffelen, also an employee of Lips, N. V. Metaalbedrijf, relating to the ingots covered by entry 0–1205. The essence of said affidavits is that the imported ingots had been produced from scrap material; that the material had been processed into ingots by a blast furnace operation solely for convenience in transportation; and that no virgin or primary metal was used in the production of said ingots.

In the case at bar, aside from the testimony that the instant merchandise was bought as scrap and sold as scrap, there is not a scintilla of proof from any qualified witness to show the source of the imported material, nor the use to which it was applied in this country after importation. Although it is stated in the record that, during the period of aluminum scarcity, smelters were crediting purchasers of reroll material for pig or scrap aluminum sold to them for smelting, no direct proof was addressed to the eventual disposition of the particular merchandise at bar. We do not know, and we may not assume, that the imported aluminum ingots were "second-hand or waste or refuse," or "obsolete, defective or damaged," and "fit only to be remanufactured," within the definition of scrap in Public Law 869, *supra*.

The collector has classified the instant merchandise as crude aluminum, not including scrap, and the burden rested with the plaintiffs not only to have established the incorrectness of that action, but to have affirmatively shown that it is scrap, as defined in said Public Law 869, *Davies, Turner & Co.* v. *United States*, 40 C.C.P.A. (Customs) 193, C.A.D. 517. That this burden has not been sustained in the instant case is manifest.

We hold, therefore, that the presumption of correctness of the collector's classification of the instant merchandise has not been overcome, and the claim for free entry within Public Law 869 is overruled.

Judgment will be entered accordingly.