(C.D. 2360)

AFRAM BROS. COMPANY *v.* UNITED STATES

United States Customs Court, Second Division

(Decided September 25, 1962)

*Shinken & Shinken* (*Leo Shinken* and *Milton Shinken* of counsel) for the plaintiff.

*Joseph D. Guilfoyle*, Acting Assistant Attorney General (*Sheila N. Ziff*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Plaintiff has invoked the jurisdiction of this court, pursuant to the terms of section 514 of the Tariff Act of 1930 (19 U.S.C. § 1514), and claims that an importation invoiced as "scrap secondary aluminum ingots for remelting only" is entitled to entry free of duty, pursuant to the provisions of Public Law 869.

The report of the collector of customs transmitting the protest to the court states that the merchandise was classified in liquidation as "Aluminum Ingots scrap" in paragraph 374 of said act (19 U.S.C. § 1001, par. 374), and duty was imposed thereon at the rate of 1½ cents per pound. The collector's assessment was apparently pursuant to paragraph 374, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802.

The pertinent text of the statutes is here set forth.

Public Law 869, 81st Congress, 2d session (64 Stat. 1093), as extended by Public Law 535 of the 82d Congress, 2d session (66 Stat. 626):

Sec. 1. (a) No duties or import taxes shall be levied, collected, or payable under the Tariff Act of 1930, as amended, or under section 3425 of the Internal Revenue Code with respect to metal scrap, or relaying and rerolling rails.

(b) The word "scrap", as used in this Act, shall mean all ferrous and nonferrous materials and articles, of which ferrous or nonferrous metal is the component material of chief value, which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured.

Sec. 2. Articles of which metal is the component material of chief value, other than ores or concentrates or crude metal, imported to be used in remanufacture by melting, shall be accorded entry free of duty and import tax, upon submission of proof, under such regulations and within such time as the Secretary of the Treasury may prescribe, that they have been used in remanufacture by melting: *Provided, however*, That nothing contained in the provisions of this section shall be construed to limit or restrict the exemption granted by section 1 of this Act.

Paragraph 374 of the Tariff Act of 1930, as modified, *supra:*

Aluminum, aluminum scrap, and alloys (except those provided for in paragraph 302, Tariff Act of 1930) in which aluminum is the component material of chief value:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Scrap_____ 1½¢ per lb.

Plaintiff's claim for free entry of the imported commodity is set forth in its protest as follows:

We claim this merchandise should be free of duty as it was *Scrap Aluminum for remelting purposes* only under Public Law 869 of the 81st Congress as amended and extended. [Emphasis added.]

It is not clear from the language of the protest whether plaintiff is relying upon the provisions of section 1 (a) and (b) or section 2.

Section 1(a), so far as pertinent here, grants freedom from duty to "metal scrap."

Section 1(b) defines the word "scrap" to mean materials and articles in chief value of ferrous and nonferrous metal "which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured."

Section 2 grants free entry to "Articles of which metal is the component material of chief value, * * * imported to be used in remanufacture by melting, * * *."

At the outset of the trial, plaintiff made the following statement—"We contend it [the importation] should come under Public Law 869 which allows free entry of scrap." Immediately thereafter, defendant requested plaintiff to "make his claim more definite and certain and advise us under what section he is claiming under 869. It appears to be Section 2, but it hasn't been specified. MR. SHINKEN: Yes, Section 2."

While section 2 permits the free entry of articles in chief value of metal, imported to be used in remanufacture by melting, it makes no reference to "scrap." Moreover, in order to secure the benefits granted by section 2, it is necessary that proof be submitted pursuant to "such regulations and within such time as the Secretary of the Treasury may prescribe" that said articles "have been used in remanufacture by melting."

Considerable testimony was introduced in an effort to support a claim under either section 1 or section 2.

We shall consider first the possible application of said section 2.

Our disposition of the case makes it unnecessary for us to give a detailed review of all the testimony.

It is quite obvious that the importation consists of "Articles of which metal is the component material of chief value, other than ores or concentrates or crude metal," and there is opinion evidence that the merchandise was "imported to be used in remanufacture by melting" and was fit only for such use. However, the record does not satisfy us that proof has been submitted pursuant to "such regulations and within such time as the Secretary of the Treasury may prescribe" that the merchandise has "been used in remanufacture by melting."

It is clear from its context that section 2, from which we have been quoting, is in its nature the grant of a privilege. It is different from the ordinary free list of the tariff act, in that section 2 is a conditionally free provision and, hence, should be strictly construed. *MacNichol Packing Co. et al.* v. *United States*, 14 Ct. Cust. Appls. 400, T.D. 42050. In that case, the court had under consideration section 313 of the Tariff Act of 1922, which provided for the remission of duty on salt for American fisheries under such regulations as the Secretary of the Treasury shall prescribe. After reviewing several earlier cases cited by it, the court observed—

From these authorities, the rule is deduced that where the Congress has offered some special grace or exemption to an importer, under regulations to be promulgated, the importer must strictly comply with such regulations, so long as they be reasonable and do not seek to alter, add to, or detract from the statute itself. And this rule is one that recommends itself to our reason. If this importer is to have some special privilege which is not extended to importers

of salt for other purposes, then he can not complain if he is required, as a part of said privilege, to comply with such regulations as have been here made, regulations which plainly only have in mind an annual accounting between the importer and the Government.

Furthermore, the regulations promulgated by the Secretary of the Treasury with respect to "remanufacture by melting" indicate that proof of that fact is a *sine qua non* to classification pursuant to section 2.

The pertinent text of regulations prescribed by the Secretary covering section 2, which will be referred to, *infra*, unlike the general regulations which the Secretary is authorized to prescribe pursuant to section 624 of the tariff act, are mandatory.

In *United Metal Goods Mfg. Company* v. *United States*, 46 C.C.P.A. (Customs) 120, C.A.D. 712, the appellate court, in considering the claim of plaintiff that certain zinc aluminum ingots which had been prepared to specifications were entitled to free entry pursuant to Public Law 869, made the following observation:

It is perfectly obvious that this statute was enacted as a war and post-war measure in an endeavor to facilitate access to scrap metal and surplus war material by the United States. * * *

and quoted from that portion of the report (No. 996, July 7, 1949) of the Ways and Means Committee of the House of Representatives, with reference to section 2, as follows—

The bill also adds a new section to the act of March 13, 1942, to allow the admission free of duty of certain articles *technically* not included in the definition of scrap contained in section 1(b). The criterion for exemption from duty is the use of the articles in question in remanufacture by melting. Entry free of duty and import tax is granted only upon submission of proof, under regulations prescribed by the Secretary of the Treasury, that such articles have been imported for, and have been used in, remanufacture by melting. *The new section added to the act of 1942, therefore, would allow the admission of articles, such as surplus war materials which are new, undamaged and not obsolete, if they are imported for, and are used only for, remelting purposes. Since there is a guaranty that such articles are to be used only in remanufacture by melting, they would not compete with domestic industry to any greater extent than would articles that fall within the definition of scrap now in the act of 1942.* [Emphasis quoted.]

At the expense of repetition, we again quote section 2 of Public Law 869:

Sec. 2. Articles of which metal is the component material of chief value, other than ores or concentrates or crude metal, imported to be used in remanufacture by melting, shall be accorded entry free of duty and import tax, upon submission of proof, under such regulations and within such time as the Secretary of the Treasury may prescribe, that they have been used in remanufacture by melting: *Provided, however,* That nothing contained in the provisions of this section shall be construed to limit or restrict the exemption granted by section 1 of this Act.

Commenting upon the scope of section 2, the court, in *United Metal*, *supra*, gave expression of its views as follows:

Coming now to the language of section 2 itself, the phrase which demonstrates that this section does not apply to the importations at bar pertains to the requirement of a "remanufacture by melting." A material to be remanufactured must necessarily have previously been manufactured. As used in this section an article which is to be remanufactured does not encompass intermediate forms assumed during processes of manufacture, but rather embraces articles manufactured *for a particular end use and subsequently imported into this country to be melted and remanufactured into other articles.* In our opinion *it does not include alloys made to definite specifications abroad in the form of ingots* and imported into this country, such as the instant importations, to be formed into particular consumer articles. [Emphasis added.]

The court further remarked that—

We agree with the lower court, which stated:

* * * It is our opinion that the articles granted free entry, when imported for use in remanufacture by melting, within the purview of section 2 of Public Law 869 were * * * not articles like the unbreakable zinc casting metal ingots which, although admittedly articles in a broad sense, are still objects of commerce to be subjected to successive manufacturing (rather than remanufacturing) processes before reaching their final status as clockcases and giftware items.

By analogy to the *United Metal* case, above quoted, we are impelled to the conclusion that the subject ingots are "* * * intermediate forms assumed during processes of manufacture * * *" and are "* * * objects of commerce to be subjected to successive manufacturing (rather than remanufacturing) processes * * *."

Looking now to the regulations of the Secretary of the Treasury with respect to the free entry of metal articles to be used in remanufacture by melting, we make reference to 86 Treas. Dec. 27, T.D. 52656, sections 64.1, 64.2(1), and 64.2(3).

Section 64.2(1) provides that "There shall be filed in connection with the entry an affidavit of the importer that the articles are to be used in remanufacture by melting."

It is noted here that plaintiff failed to move into evidence certain papers contained in the official court file upon which it relies. Consequently, they are not a part of the record as evidence in the case, and the court may not consider them as such. *R. C. Williams & Co., Inc.* v. *United States*, 26 C.C.P.A. (Customs) 210, C.A.D. 19. Even had they been admitted into evidence, the proof contained therein would have fallen far short of the requirements of the regulations.

The court file contains a letter, dated November 25, 1953, signed by the vice president of F. W. Myers & Co., addressed to A. C. F. Schewe, deputy collector of customs at Port Huron, Mich., bearing the statement "We hereby certify that these scrap aluminum ingots were imported for remelting purposes." However, this letter was not notarized and, consequently, does not comply with section 64.2(1).

Another letter, dated February 7, 1956, in the court file, from Israel Afram, the consignee of the imported merchandise, addressed to F. W. Myers & Co. (which is notarized), includes the statement that the merchandise "contained Aluminum Scrap suitable for remelting purposes only." This affidavit fails to comply with section 64.2(1), in that there was no attempt to establish that it was filed at any time prior to liquidation (April 13, 1956) or a period during which a valid reliquidation might be completed. Moreover, the letter was not addressed to the collector, but to the importer.

Of greater importance, plaintiff has failed to comply with section 64.2(3), which section contains the following requirements:

(1) within 3 years from the date of entry [March 4, 1953]

(2) the importer shall submit to the collector of customs at the port of entry

(3) an affidavit of the superintendent or manager of the plant at which the articles were used in remanufacture by melting, showing

(4) the name and location of the plant,

(5) the entry number, date, and port of entry (if the affiant is not in possession of this information, a reference to invoices, purchase orders, or other documents which will identify the shipment with the entry may be substituted),

(6) the date or inclusive dates of processing of the articles,

(7) a description of the processing in sufficient detail to enable the collector to determine whether such processing constituted a use in remanufacture by melting, and

(8) the affidavit shall be in duplicate, one copy to be forwarded to the comptroller of customs.

As was stated, *supra*, these regulations have not been complied with.

It is obvious from the foregoing review of the record and the applicable statute and regulations that plaintiff has utterly failed to substantiate its claim for free entry, pursuant to the terms of section 2, *supra*.

Consideration will now be given to the provisions of section 1 (a) and (b) of Public Law 869, as extended.

Not only is the language of the protest somewhat ambiguous, but it is further clouded by the opening statement of plaintiff at the trial that the merchandise "should come under Public Law 869 which allows free entry of scrap" and, in almost the same breath, claimed that the merchandise should be classified in section 2, *supra*.

While the protest claims that the merchandise is "Scrap Aluminum for remelting purposes," section 1(b) of Public Law 869 defines the word "scrap" to mean "materials and articles" in chief value of metal "which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are *fit only to be remanufactured*." [Italics supplied.]

Granting, *arguendo*, that the protest is specific enough to invoke the terms of section 1 (a) and (b), the court is of the opinion that the evidence fails to satisfy that claim.

Obviously, Congress has provided for two kinds of aluminum scrap. In paragraph 374, as modified, *supra*, aluminum scrap is enumerated and made dutiable at 1½ cents per pound. As a matter of fact, the collector classified the importation as "Aluminum Ingots scrap" and imposed duty at 1½ cents per pound, which is the rate provided by paragraph 374, as modified. There is a presumption that the collector found all the facts necessary to support his decision, and his classification and assessment of duty at 1½ cents per pound indicate that he was of the opinion that the scrap in controversy was not of the kind described in section 1 (b) of Public Law 869, which is granted freedom from duty.

The record before us does not satisfactorily establish that the subject merchandise consists of "materials and articles * * * which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured," as described in said section 1 (b).

At the trial, plaintiff moved into evidence the testimony of M. W. Hollands of Burlington, Ontario, Canada, who, in 1953, was employed by the General Smelting Co. of Canada, Ltd., the producer of the imported merchandise. This testimony was taken pursuant to a commission issued by the court. The Government filed objections to 14 of the questions which were answered by Hollands, and the trial judge on circuit took the objections under advisement, to be reviewed by a full division.

The first question, No. 16, reads:

Q. Please state a description of the type materials melted into the aluminum loaded into car C.N. 486301?

The objection to this question was based on the ground that the record up to this point showed that no analysis had been taken of the merchandise by Hollands and that he had no actual knowledge of the contents of the materials.

The objection is sustained.

The remaining 13 questions, which were objected to, follow:

[No. 24] Q. Please state what explanation if any you have for the aluminum ingot in car C.N. 486301 not being made to a definite specification?

[No. 25] Q. Please state what reason, if any, was given for the aluminum ingot in car C.N. 486301 not being made to a definite specification?

[No. 30] Q. Please state whether the aluminum loaded into car C.N. 486301 on February 27, 1953 could have been used for manufacturing purposes?

[No. 31] Q. Please state what differences in analysis existed between the aluminum contained in car C.N. 486301 and the scrap from which this aluminum was produced?

[No. 32] Q. Please state and describe in detail how the aluminum loaded into car C.N. 486301 differs from the scrap from which the aluminum was produced?

[No. 33] Q. Please state what is meant by aluminum ingot for commercial purposes?

[No. 34] Q. Please state how aluminum ingot for commercial purposes differs from the aluminum loaded into car C.N. 486301 on February 27, 1953?

[No. 35] Q. Please state whether you believe, based on your experience, the aluminum ingot in car C.N. 486301 meets the commercial specifications for aluminum alloy?

[No. 36] Q. Please state, based upon your experience, whether in your opinion the aluminum ingots loaded into car C.N. 486301 could have been used for anything besides smelting purposes?

[No. 37] Q. Please state whether the aluminum ingot loaded into car C.N. 486301 could be used commercially without remanufacture?

[No. 38] Q. Please state whether the aluminum in car C.N. 486301 could be used in remanufacture without remelting?

[No. 39] Q. Please state what is meant by crude aluminum?

[No. 40] Q. Please state, based upon your experience, what, in your opinion, was the difference between the aluminum ingot in car C.N. 486301 and crude aluminum?

The objections, in substance, that the witness had not been properly qualified to answer these questions, are sustained.

We are, therefore, without definite proof as to the exact character of the articles or materials which went into the production of the imported aluminum ingots. The record herein does not provide a factual basis upon which a finding might be predicated to determine whether the basic material was scrap, within the meaning of section 1(b), and we may not supply from our imagination what should have been established by competent proof.

Moreover, the question still remains whether scrap of the type described in section 1(b), after being melted and converted into an ingot shown to be more than 96 per centum pure aluminum, can properly be classified as scrap within the definition of that term in Public Law 869.

It is significant that Congress has, in several instances, drawn a distinction between ingots (or pigs) and scrap. Illustrations may be noted in paragraph 301 of the Tariff Act of 1930 which provides for "Iron in pigs" at one rate of duty and "scrap steel" at a different rate. Paragraph 304 of said act provides specifically for "steel ingots" and "cogged ingots." Paragraph 316 of said act provides separately for "ingots" and "scrap." Paragraph 392 of said act enumerates "lead in pigs," "scrap lead," and "antimonial lead." *Cf. C. J. Tower & Sons* v. *United States*, 33 Cust. Ct. 223, C.D. 1657.

It may be noted here that, in the smelting industry, the words "pigs" and "ingots" are given substantially the same meaning. "Metals

Handbook," 1948 edition, page 10, published by The American Society for Metals.

As a matter of fact, Hollands, in answer to question No. 15 of his affidavit (exhibit 1), referred to the material in controversy as "Aluminum ingots or small pigs."

In the *Tower* case, *supra*, the aluminum ingots there under consideration contained from 86 to 88 per centum aluminum, produced from scrap, consisting of aluminum recovered from crashed aircraft, aluminum dross, high zinc type aluminum clips, contaminated aluminum turnings, and irony pots and pans, which were used solely as a deoxidizing agent in the manufacture of iron or steel products. There was testimony, in that case, that said ingots would—

* * * conform to the grade 850–A of the specifications B 37–49 of the A.S.T.M. [American Society for Testing Materials].

It appears from defendant's exhibit C, in the instant case, a laboratory report of the analysis of a sample taken from the shipment in issue which was made by defendant's witness, William H. Bailey, a Government chemist, that "The sample meets specifications for ASTM 980A grade aluminum."

David J. Brown, testifying for plaintiff in the present case as president of the Aluminum Refining Co., Sheboygan Falls, Wis., who purchased the instant importation, stated that his company had analyzed the merchandise, and a certified report of chemical analysis was received in evidence as plaintiff's exhibit 2. The report states in part—

Several representative samples taken at random showed the following Chemical content.

| Copper | .63 | Manganese | 1.01 |
| Iron | .81 | Magnesium | nil |
| Zinc | .12 | Tin | nil |
| Silicon | .68 | Lead | .13 |
| Chromium | .20 | Titanium | .01 |
| Nickel | .16 | | |

This indicates a total of presumably unwanted materials totaling 3.75 per centum. Although not stated, it is assumed that the remainder was 96.25 per centum aluminum, while the aluminum content of the ingots in the *Tower* case, as above stated, was 86 to 88 per centum. As a matter of fact, on cross-examination, Brown admitted that an ingot responding to the analysis in exhibit 2 may be used for deoxidizing purposes in the manufacture of iron and steel.

In the circumstances above related, an obvious anomaly would be created in holding that an aluminum ingot containing slightly more than 96 per centum aluminum is scrap, within the purview of Public Law 869, while the ingots in the *Tower* case, containing but 86 to 88 per centum aluminum, were held not to be such scrap.

Upon the record before us and for the reasons stated, we find and hold that plaintiff has failed to sustain its claim that the merchandise falls within the purview of Public Law 869, as extended.

The protest is, therefore, overruled, and judgment will issue accordingly.