(C.D. 2609)

ALLOYS & CHEMICALS CO., INC., ET AL. v. UNITED STATES

United States Customs Court, Second Division

(Decided on rehearing [Abstract 64709] January 10, 1966)

*Siegel, Mandell & Davidson* (*David Serko* and *Allan H. Kamnitz* of counsel) for the plaintiffs.
*John W. Douglas*, Assistant Attorney General (*Alfred A. Taylor, Jr., James F. O'Hara*, and *Glenn E. Harris*, trial attorneys), for the defendant.

Before RAO and FORD, Judges

RAO, Chief Judge: Seven importations of aluminum material were classified by the collector of customs within different provisions of paragraph 374 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802. For ready reference, we quote the text of said statutory provision *in toto*:

Aluminum, aluminum scrap, and alloys (except those
    provided for in paragraph 302, Tariff Act of 1930) in
    which aluminum is the component material of chief
    value:
        In crude form (except scrap) _____ 2¢ per lb.
        In coils, plates, sheets, bars, rods, circles, disks,
           blanks, strips, rectangles, and squares_____ 3¢ per lb.
        Scrap _____ 1½¢ per lb.

Set forth below is a listing of the protest numbers, entry numbers, invoice descriptions of the merchandise involved, and the specific provisions of duty in paragraph 374, as modified by the General Agreement on Tariffs and Trade, *supra*, relied upon by the collector of customs in each case:

| Protest No. | Entry No. | Invoice description | Collector's action |
|---|---|---|---|
| 238485-K | 03335 | Duraluminum scrap | Aluminum scrap—1½¢ per lb. |
| 238481-K | 02493 | Ingots of aluminum alloy ingots | Aluminum scrap—1½¢ per lb. |
| 238482-K | 02579 | Aluminum scrap re-melted into ingots | Aluminum scrap—1½¢ per lb. |
| 238483-K | 02922 | Aluminum scrap re-melted into scrap | Aluminum scrap—1½¢ per lb. |
| 238484-K | 03316 | Ingots aluminum scrap | Aluminum scrap—1½¢ per lb. |
| 237333-K | 02260 | Aluminum scrap re-melted into ingots | Aluminum in crude form (except scrap)—2¢ per lb. |
| 237335-K | 01575 | Duraluminum rods, bars, plates, ingots | Aluminum in coils, plates, sheets, bars, rods, circles, disks, blanks, strips, rectangles, and squares—3¢ per lb. |

Although couched in rather broad terms in their protests, it is apparent therefrom that, in each instance, plaintiffs are claiming the benefit of free entry, by virtue of section 1, Public Law 869 of the 81st Congress, second session (64 Stat. 1093), which reads as follows:

SEC. 1. (a) No duties or import taxes shall be levied, collected, or payable under the Tariff Act of 1930, as amended, or under section 3425 of the Internal Revenue Code with respect to metal scrap, or relaying and rerolling rails.

(b) The word "scrap", as used in this Act, shall mean all ferrous and nonferrous materials and articles, of which ferrous or non-ferrous metal is the component material of chief value, which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured.

The evidence upon which the instant case has been presented for decision consists of the testimony of one witness called to testify on behalf of plaintiffs and collective exhibit A received in evidence (without being marked) upon its introduction by defendant. Said collective exhibit A consists of seven United States Customs Laboratory reports, one for each of the entries involved herein. In view of the fact that specific reference will be made, *infra*, to matter contained

in said reports, we deem it advisable to set forth in full the "report" portion of said documents.

Entry No. 03335:

The sample submitted is one section of an aluminum alloy ingot.

Composition

| | |
|---|---|
| Copper | 4.5% |
| Iron | 1.1% |
| Silicon | .8% |
| Magnesium | .9% |
| Manganese | .4% |
| Zinc | 2.0% |
| Aluminum | 90.3% |

Weight of section of ingot—7¼ pounds.

The sample submitted meets the chemical requirements of ASTM Grade 900A, Aluminum for use in the manufacture of iron and steel.

Entry No. 02493:

The sample submitted consists of a large aluminum ingot (over 15 lbs.) having the following composition:

| | | | |
|---|---|---|---|
| Copper | 3.3% | Manganese | .4% |
| Silicon | 2.7% | Zinc | 1.5% |
| Iron | .7% | Aluminum | 90.2% |
| Magnesium | 1.2% | | |

The sample meets the chemical requirements for ASTM Grade 900A for aluminum for use in the manufacture of iron and steel.

Entry No. 02579:

The sample submitted is an aluminum alloy ingot having the following composition:

| | | | |
|---|---|---|---|
| Copper | 4.4% | Manganese | .6% |
| Silicon | .7% | Zinc | .1% |
| Iron | .8% | Aluminum | 92.7% |
| Magnesium | .7% | | |

It conforms to the chemical requirements of ASTM Grade 920A, aluminum for use in iron and steel manufacture. Otherwise it does not have the composition of any specification for aluminum alloy ingots known to this office. However, it also conforms to the chemical requirements for Alloy No. 14 or 17, U.S. Navy Spec. 46A7e which is similar to various other specifications (ASTM, Army-Navy, Fed. Spec., etc.) for Aluminum Alloy in Bars, Rods, Wire, Shapes, Sheet and Plates.

Entry No. 02922:

The sample submitted consists of a section of an aluminum alloy ingot having the following composition:

| | | | |
|---|---|---|---|
| Copper | 3.7% | Manganese | .6% |
| Iron | .6% | Zinc | .3% |
| Silicon | .5% | Aluminum | 92.8% |
| Magnesium | 1.5% | | |

The sample submitted does not meet any commercial specification for aluminum alloys known to this office.

Entry No. 03316:

The sample submitted is an aluminum alloy ingot weighing 22¾ pounds.

### Composition

| Copper | 3. 6% | Manganese | . 3% |
|--------|-------|-----------|------|
| Iron | 1. 1% | Aluminum | 89. 6% |
| Silicon | 2. 5% | Zinc | 1. 8% |
| Magnesium | 1. 1% | | |

The sample submitted meets the chemical requirements of ASTM Grade 850A., Aluminum for use in the manufacture of Iron & Steel.

Entry No. 02260:

The sample submitted is a half-round cylinder weighing nine and one-half (9½) pounds and having the following composition:

| Copper | 5. 3% | Manganese | 0. 3% |
|--------|-------|-----------|-------|
| Iron | 0. 8% | Zinc | 2. 1% |
| Silicon | 2. 6% | Aluminum | 87. 4% |
| Magnesium | 1. 5% | | |

The sample submitted conforms to the chemical requirements of ASTM Specification 850A for aluminum for use in the manufacture of iron and steel.

Entry No. 01575:

The sample submitted consists of a 12″ x 12″ x 1⅝″ aluminum slab, weighing twenty-four (24) pounds, having the following composition:

| Copper | 5. 0% | Manganese | 0. 3% |
|--------|-------|-----------|-------|
| Iron | 2. 0% | Zinc | 2. 3% |
| Silicon | 2. 5% | Aluminum | 86. 3% |
| Magnesium | 1. 6% | | |

The sample submitted conforms to the chemical requirements of ASTM Specification 850A for aluminum for use in the manufacture of iron and steel.

The witness referred to above was Sidney Danziger, executive vice president of the Alloys & Chemicals Corp., an outgrowth of Alloys & Chemicals Co., Inc., the ultimate consignee of all of the importations involved herein. The business of Alloys & Chemicals is the smelting and refining of aluminum and the manufacture of aluminum alloys as well as trading in various aluminum products. Danziger's duties are chiefly executive in nature, and he is primarily in charge of the purchase of scrap metals. He explained that he has been in the secondary metal ingot business for approximately 40 years and has served in an executive capacity in secondary materials associations both in this country and aboard, as well as having edited a book and given lectures on scrap metals.

Upon being referred to entry 03335 accompanying protest 238485–K, Witness Danziger stated it covered Duraluminum scrap which had been placed in ingot form for shipping purposes only. Said merchandise was purchased as scrap and was not purchased to any particular chemical specification. From an examination of the report of the United States Customs Laboratory accompanying said entry, he concluded that the material "was made from a heterogeneous lot of scrap." That conclusion was based on the impurities of 2 percent zinc and 1.1 percent iron contained therein and which were not added as alloys.

The laboratory report contains the statement—

The sample submitted meets the chemical requirements of ASTM Grade 900A, Aluminum for use in the manufacture of iron and steel.

Danziger testified he is familiar with the ASTM specifications referred to, described the process by which merchandise is produced to such specifications, and stated that aluminum alloy of number 900A ASTM specification is commonly known as deoxidizing aluminum. The merchandise covered by entry 03335 accompanying protest 238485–K, in its condition as imported, was not fit for such use. The witness admitted, however, that he did not see the merchandise referred to at the time of importation.

The merchandise covered by entry 03335 was not bought as "specification ingot" nor was it sold as such. When the merchandise was purchased, Danziger had an analysis made of it, from which he concluded the merchandise could not be used without being remanufactured.

With reference to the importation covered by entry 02260 with protest 237333–K, Danziger testified said merchandise was not purchased by his company as being in conformity with ASTM specification 850A and that said merchandise was not sold but was used by his company's Cleveland plant as scrap "for alloying with other types of scrap, to make up a specification aluminum."

On being asked whether he had purchased the importations at bar from the same source of supply, Witness Danziger replied:

In most cases it was furnished from exporters who exported from European countries, but in most cases also I did know where it originally had been, where the accumulation of metals was.

He also stated that, from his knowledge of prices of primary aluminum and scrap aluminum, the price paid for the instant importations was such that the merchandise must necessarily have been scrap.

The testimony of Witness Danziger concluded with the statement that, as to all the merchandise at bar, it could not be used until it was smelted and refined and that it had no known commercial use without being refined.

A stipulation of fact was entered into by the parties that—

* * * the testimony of plaintiffs' witness pertaining to any laboratory reports or portions thereof be considered to pertain to all the reports received in evidence.

Both plaintiffs and defendant make reference in their briefs to the fact that, by the terms of paragraph 374 of the Tariff Act of 1930, "aluminum scrap" is *eo nomine* provided for with a specific rate of duty applicable thereto and to the further fact that, by Public Law 869, 81st Congress, second session, metal scrap has been granted the benefit of entry free of duty. These seemingly conflicting provisions for "scrap," insofar as customs duties are concerned, were met head on in the case of *Afram Bros. Company* v. *United States*, 49 Cust. Ct. 53, C.D. 2360, wherein the court stated—

Obviously, Congress has provided for two kinds of aluminum scrap. In paragraph 374, as modified, *supra*, aluminum scrap is enumerated and made dutiable at 1½ cents per pound. As a matter of fact, the collector classified the importation as "Aluminum Ingots scrap" and imposed duty at 1½ cents per pound, which is the rate provided by paragraph 374, as modified. There is a presumption that the collector found all the facts necessary to support his decision, and his classification and assessment of duty at 1½ cents per pound indicate that he was of the opinion that the scrap in controversy was not of the kind described in section 1(b) of Public Law 869, which is granted freedom of duty.

There are instances in the field of customs law where, in the classification of merchandise, perplexing questions may arise in construing tariff statutes as to the meaning of words, the presence of ambiguity, the significance of punctuation, the extent and nature of proof required, *inter alia*. In the case at bar, however, we have a relatively simple issue. Public Law 869, 81st Congress, second session, spells out, in clear unambiguous language, the type of merchandise Congress intended to be granted the benefit of free entry as metal scrap. For a claimant to receive its benefits, satisfactory evidence must be presented to show the source of the metal scrap and to establish that, in its condition as imported, it was only fit to be remanufactured. Although the witness who testified in the instant case was a man of wide experience and extensive background in the secondary materials industry, it appears from the record herein that he did not have specific information as to the source from which the instant merchandise was derived, whether, as stated in Public Law 869, *supra*, from ferrous or nonferrous materials or articles which are "second-hand or waste or refuse" or are "obsolete, defective or damaged." His testimony on that important phase of plaintiffs' essential proof is at best vaguely inferential rather than direct and positive.

This failure of basic proof on the part of plaintiffs to bring their importations within the definition of "scrap" in Public Law 869, 81st

Congress, second session, by showing the state of the materials or articles from which the instant aluminum in ingot form was produced is equally applicable to the seven importations here involved. Nevertheless, it would appear from defendant's brief that there is an inclination on the part of the Government to concede the correctness of plaintiffs' claim as to entry 02922 covered by protest 238483–K. In said brief, the following statement is made—

Defendant does not, however, place its defense primarily upon the presumption that the material in issue was never of such a character as to be properly termed "scrap." [6] * * *

The footnote designated as 6 states—

For this reason, and on the authority of *Gallagher & Ascher Company* v. *United States*, 40 Cust. Ct. 449, Abstract 61737, defendant does not contend that the Collector's classification of Entry No. 02922 (Protest No. 238483–K) was correct or that the presumption of correctness attaching to the classification of that importation has not been overcome. Contrary to the remaining entries, the Customs Laboratory determined that the above material did not conform to any known specification for deoxydizing aluminum. Although the evidence as to the original scrap nature of the material is extremely weak, defendant is of the view that, when combined with the laboratory report (but *only* then), it is sufficient to overcome the presumption of correctness and that that one protest is therefore controlled by the *Gallagher & Ascher* decision. [Italics quoted.]

The laboratory reports, defendant's collective exhibit A, dealing as they do for the most part (including entry 02922) with a chemical analysis of the imported aluminum in ingot form, so shaped evidently for convenience in transportation, can not be expected to furnish proof of the origin of the materials or articles from which said ingots were made, one of the basic requirements of Public Law 869, but can only serve as some evidence to enlighten the court whether or not such material at the time of importation was fit only to be remanufactured, the second of the basic requirements.

The case of *Gallagher & Ascher Company* v. *United States*, 40 Cust. Ct. 499, Abstract 61737, to which defendant refers, involves merchandise classified as aluminum ingots in crude form (not including scrap) in paragraph 374 of the Tariff Act of 1930, as modified, and assessed with duty accordingly and claimed to be properly entitled to entry free of customs duty in Public Law 869, 81st Congress, second session, as amended. Although, in our opinion, the evidence offered in said *Gallagher & Ascher* case is clearly distinguishable from that at bar, the court is inclined to accept defendant's concession with respect thereto insofar as the merchandise covered by entry 02922 accompanying protest 238483–K is concerned.

In said *Gallagher & Ascher* case, there was substantial evidence to support the classification reached, to wit, that the importation there

at bar was entitled to free entry, whereas here such proof is lacking. According to the court's opinion in the *Gallagher & Ascher* case, the testimony established that the merchandise consisting of aluminum ingots was obtained "by taking scrap aluminum turnings and reducing them in a furnace to ingot form; that these ingots were not made purposely to any kind of specification; that these ingots had no uniformity of quality or analysis; that the turnings had no other use; and that they were reduced to ingot form solely for convenience in transportation and handling, because the cost of shipping in the form of turnings would have been prohibitive." It was further held by the court in said case that—

The evidence also establishes that the subject ingots were used for remanufacturing purposes as part of the mix in the production of specification ingots; that the imported ingots had no other use and were fit for no other use than to be blended with other aluminum scrap to make specification ingots; that these imported ingots were not fit for direct manufacture, because they did not have the required shape or weight for use in rolling mills or extrusion mills or for castings; that they could not be used for deoxidizing purposes, because they were too large and, in their imported condition, were too dirty, tarnished, and contained moisture, and had no uniformity of analysis; * * *.

From the foregoing summaries of testimony from the *Gallagher & Ascher* case, it will be seen that evidence was there presented as to the origin of the materials or articles from which the aluminum ingots in issue were produced.

In two previous cases presented for determination, this court was confronted with a situation analogous to that at bar. In the earlier of the two cases, *Lando Products, Inc., and W. J. Byrnes & Co., Inc.* v. *United States*, 44 Cust. Ct. 440, Abstract 64128, we were led to say—

In the case at bar, aside from the testimony that the instant merchandise was bought as scrap and sold as scrap, there is not a scintilla of proof from any qualified witness to show the source of the imported material, nor the use to which it was applied in this country after importation. Although it is stated in the record that, during the period of aluminum scarcity, smelters were crediting purchases of reroll material for pig or scrap aluminum sold to them for smelting, no direct proof was addressed to the eventual disposition of the particular merchandise at bar. We do not know, and we may not assume, that the imported aluminum ingots were "second-hand or waste or refuse," or "obsolete, defective or damaged," and "fit only to be remanufactured," within the definition of scrap in Public Law 869, *supra*.

And in the circumstances of the case of *Afram Bros. Company* v. *United States*, to which reference has been made, *supra*, we stated—

We are, therefore, without definite proof as to the exact character of the articles or materials which went into the production of the imported aluminum ingots. The record herein does not provide a

factual basis upon which a finding might be predicated to determine whether the basic material was scrap, within the meaning of section 1(b), and we may not supply from our imagination what should have been established by competent proof.

As in the *Lando* and *Afram* cases, *supra*, we are again confronted with a record devoid of positive evidence that the merchandise at bar had its origin in materials or articles which were "second-hand or waste or refuse, or are obsolete, defective or damaged" within the definition of scrap in Public Law 869, 81st Congress, second session, and "we may not supply from our imagination what should have been established by competent proof."

All cases cited by the parties in their briefs have been given consideration but nothing contained therein deters us from the conclusion herein reached.

Except as hereinafter indicated, the claim for entry free of customs duty pursuant to Public Law 869, *supra*, of the importations covered by six of the seven protests, enumerated in the schedule attached to and made part of this decision, is, accordingly, overruled. As to entry number 02922, covered by protest 238483–K, the claim for free entry within the provisions of said Public Law 869 is sustained.

Judgment will be entered accordingly.