ALLOYS & CHEMICALS CO., INC., CARSON M. SIMON & CO. *v.* UNITED STATES (No. 5244)*

United States Court of Customs and Patent Appeals, May 11, 1967**

*Serko & Sklaroff (David Serko, Murray Sklaroff,* of counsel) for appellants. *Barefoot Sanders,* Assistant Attorney General, *Andrew P. Vance,* Chief, Customs Section, *Irving A. Mandel* for the United States.

[Oral argument April 4, 1967 by Mr. Serko and Mr. Mandel]

Before WORLEY, Chief Judge, RICH, SMITH, ALMOND, Associate Judges, and WILLIAM H. KIRKPATRICK***

ALMOND, Judge, delivered the opinion of the court:

Alloys & Chemicals Co., Inc. et al, appeal from the judgment of the United States Customs Court, Second Division, 56 Cust. Ct. 38, C.D. 2609.

Seven separate protests were consolidated for trial below. The merchandise involved consists of ingots, slabs, cylinders, or other shapes, in which aluminum is the component material of chief value. One protest was sustained and is not of concern here.

The merchandise was classified under paragraph 374, Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, which reads, in pertinent part, as follows:

> Aluminum, aluminum scrap, and alloys (except those provided for in paragraph 302, Tariff Act of 1930) in which aluminum is the component material of chief value:
>
> | | |
> |---|---|
> | In crude form (except scrap) _____ | 2 cents per lb. |
> | In coils, plates, sheets, bars, rods, circles, disks, blanks, strips, rectangles, and squares_____ | 3 cents per lb. |
> | Scrap _____ | 1½ cents per lb. |

Appellants contend that the merchandise is entitled to free entry as "scrap" within the purview of Section 1, Public Law 869, 81st Cong., 2d Sess., 64 Stat. 1093, which, in pertinent part, is as follows:

*C.A.D. 912.
**Petition for rehearing denied October 5, 1967.
***Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

Sec. 1. (a) No duties or import taxes shall be lievied, collected, or payable under the Tariff Act of 1930, as amended, * * * with respect to metal scrap * * *.

(b) The word "scrap," as used in this Act, shall mean all ferrous and non-ferrous materials and articles, of which ferrous or nonferrous metal is the component material of chief value, which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured.

A sample of the merchandise in each involved entry was subjected to analysis by the Customs Laboratory at Philadelphia. The several analyses are described in Defendant's Collective Exhibit A introduced below, which discloses, in material substance, the following:

(a) Entry No. 01575 (Protest 237335–K), [Duty assessed 3 cents/lb.] : Analysis of the sample (a 12″ x 12″ x ⅝″ slab weighing 24 lbs.) disclosed a composition of 86.3% aluminum 5.0% copper, and lesser percentages of ferrous and other non-ferrous metals. "The sample submitted conforms to the chemical requirements of ASTM [1] Specification 850A for aluminum for use in the manufacture of iron and steel."

(b) Entry No. 02260 (Protest 237333–K) : Analysis of the sample (a half-round cylinder weighing 9½ lbs.) disclosed a composition of 87.4% aluminum, 5 :3% copper and lesser percentages of ferrous and other non-ferrous metals. "The sample * * * conforms to the chemical requirements of ASTM * * * for aluminum for use in the manufacture of iron and steel."

(c) Entry No. 02493 (Protest 238481–K) : Analysis of the sample (an ingot weighing in excess of 15 lbs.) disclosed a composition of 90.2% aluminum, 3.3% copper, and lesser percentages of ferrous and other non-ferrous metals. "The sample meets the chemical requirements for ASTM * * * for aluminum for use in the manufacture of iron and steel."

(d) Entry No. 02579 (Protest 238482–K) : Analysis of the sample ("an aluminum alloy ingot") disclosed a composition of 92.7% aluminum, 4.4% copper, and lesser percentages of ferrous and other non-ferrous metals. "It conforms to the chemical requirements of ASTM * * *, aluminum for use in iron and steel manufacture * * * as well as to "* * * chemical requirements for Alloy No. 14 or 17, U. S. Navy Spec. 46A7e * * *."

(e) Entry No. 03316 (Protest 238484–K) : Analysis of the sample ("an aluminum alloy ingot weighing 22¾ pounds") disclosed a composition of 89.6% aluminum, 3.6% copper, and lesser percentages of ferrous and other non-ferrous metals. "The sample submitted meets the chemical requirements of ASTM * * *, Aluminum for use in the manufacture of Iron and Steel."

(f) Entry No. 03335 (Protest 238485–K) : Analysis of the sample ("one section of an aluminum alloy ingot weighing 7¼ lbs.") disclosed a composition of 90.3% aluminum, 4.5% copper, and lesser percentages of ferrous and other non-ferrous metals. "The sample submitted meets the chemical requirements of ASTM * * *, Aluminum for use in the manufacture of iron and steel."

Appellants (plaintiffs below) called one witness, Mr. Sidney Danziger, its executive vice president. His experience in the "secondary metal ingot" field approximated forty years. He had held executive positions in trade associations in the field of scrap metals, and had edited a book and lectured on the subject of scrap metals. By virtue of his position with appellants, he is in "charge of the purchase of scrap materials." He is not a metallurgist or a chemical engineer.

---

[1] ASTM STANDARDS published by the American Society for Testing Materials.

According to this witness, the importer is engaged in the business of smelting and refining aluminum, the manufacture of aluminum alloys, and trading in various aluminum products. The principal alloys manufactured are for use in sand and die casting, as well as "for destructive [sic] purposes, for steel mill operations." When asked if his company manufactured anything other than specification ingots, the witness stated that the manufactures were only specification aluminum alloys in various forms (ingot shot grain). He stated that his company was a secondary smelter of nonferrous products.

In response to a question propounded by the court, the witness stated that "secondary" nonferrous metals related to metal which had been in prior use and which by reason of "obsolescence or bad manufacture" must be reprocessed; and that it is "something that does not come from the earth directly." He defined "scrap" as "the heterogeneous product coming from various forms of destruction" and which is used again in "processing by smelters and refiners" and "other types of manufacturers."

Danziger further testified that he was familiar with the ASTM specifications for aluminum and that the merchandise in Entry No. 03335 was not purchased to any particular chemical specification but as "Duraluminum scrap, which chemical specification we know from prior experience"; that the involved merchandise was generally "furnished from exporters who exported from European countries," but in most cases he knew where it originally had been; and that he had not actually seen the imported merchandise itself. The witness observed that the aluminum content of the subject entries ranged from 80% to well over 90%, maintaining, however, that whether such ingots are specification ingots is dependent upon "the other elements that are added to it and are part of it." He referred to the Customs Laboratory Report relating to Entry 03335 and stated that in his opinion, contrary to said report, the ingots were not fit, in their condition as imported, for use as deoxidizing aluminum in the manufacture of iron and steel or in any direct manufacture. He based this opinion upon what he asserted to be unsuitability of shape, lack of surface cleanliness, and lack of uniformity, admitting, however, that he had not seen the product as imported. He further stated that his company does not always receive or refine all the scrap it purchases, but often sells such material to other smelters and refiners; that a portion of the merchandise imported was refined by his company; and that another portion was resold, without further processing, to another smelter and refiner, but that it was sold as "scrap" and would have to be further smelted and refined by the purchaser in order to obtain specification ingots.

In summary, Danziger stated that, as to all of the merchandise involved, it could not be used again until it was smelted and refined, and that it had no known commercial use without being refined.

It is apparent that under the terms of paragraph 374 of the Tariff Act of 1930, *"aluminum scrap"* is *eo nomine* provided for. It is also apparent that Public Law 81–869 provides for *"metal scrap"* and, under definitive conditions stated, accords it entry free of duty. The Customs Court, observing these "seemingly conflicting" provisions for "scrap," noted that they were met "head on" in *Afram Bros. Company* v. *United States*, 49 Cust. Ct. 53, C.D. 2360, wherein the court stated:

Obviously, Congress has provided for two kinds of aluminum scrap. In paragraph 374, as modified, *supra*, aluminum scrap is enumerated and made dutiable at 1½ cents per pound. As a matter of fact, the collector classified the importation as 'Aluminum Ingots scrap" and imposed duty at 1½ cents per pound, which is the rate provided by paragraph 374, as modified. There is a presumption that the collector found all the facts necessary to support his decision, and his classification and assessment of duty at 1½ cents per pound indicate that he was of the opinion that the scrap in controversy was not of the kind described in section 1(b) of Public Law 869, which is granted freedom of duty.

It is obvious that "metal scrap" is a generic term, inclusive of the more specific term "aluminum scrap." The burden here rests on the importer not only to rebut the presumption of correct classification by the collector but also to establish by competent proof that the imported merchandise is properly classifiable under the provisions of Public Law 869. ▆ In order to discharge this burden and thereby avail themselves of the free entry provision of Public Law 869, appellants must prove the merchandise to be (1) "second-hand or waste or refuse or * * * obsolete, defective, or damaged" and, in addition thereto, that it is (2) "fit *only* to be remanufactured." (Emphasis ours.) In our view the applicable law, and the facts adduced of record, support the statement of the Customs Court that:

Public Law 869, 81st Congress, second session, spells out, in clear unambiguous language, the type of merchandise Congress intended to be granted and the benefit of free entry as metal scrap. For a claimant to receive its benefits, satisfactory evidence must be presented to show the source of the metal scrap and to establish that, in its condition as imported, *it was only fit to be remanufactured.* Although the witness who testified * * * was a man of wide experience and extensive background in the secondary materials industry, it appears from the record herein that he did not have specific information as to the source from which the * * * merchandise was derived, whether, as stated in Public Law 869, *supra*, from ferrous or nonferrous materials or articles which are "second-hand or waste or refuse" or are "obsolete, defective or damaged." His testimony on that important phase of plaintiffs' essential proof is at best vaguely inferential rather than direct and positive. [Emphasis ours.]

During the course of its opinion the Customs Court referred to the cases of *Lando Products, Inc., and W. J. Byrnes & Co., Inc.* v. *United*

*States*, 44 Cust. Ct. 440, Abs. 64128, and *Afram Bros. Company* v. *United States*, supra. These cases present fact situations analogous to that of the case at bar. In *Lando Products* the court stated:

* * * aside from the testimony that the instant merchandise was bought as scrap and sold as scrap, there is not a scintilla of proof from any qualified witness to show the source of the imported material, nor the use to which it was applied in this country after importation. Although it is stated in the record that, during the period of aluminum scarcity, smelters were crediting purchases of reroll material for pig or scrap aluminum sold to them for smelting, no direct proof was addressed to the eventual disposition of the particular merchandise at bar. We do not know, and we may not assume, that the imported aluminum ingots were "second-hand or waste or refuse," or "obsolete, defective or damaged," and "fit only to be remanufactured, within the definiton of scrap in Public Law 869, supra.

In the subsequent *Afram Bros.* case the Customs Court was confronted with a lack of proof situation closely analogous to the case at bar. The court found that:

We are * * * without definite proof as to the exact character of the articles or materials which went into the production of the imported aluminum ingots. The record herein does not provide a factual basis upon which a finding might be predicated to determine whether the basic material was scrap, within the meaning of section 1(b), and we may not supply from our imagination what should have been established by competent proof.

In the instant case the sole witness upon whose testimony appellants must rely was unable to identify the specific source from which the imported goods emanated in Europe. He stated that he had not seen the imported merchandise and did not know of its whereabouts prior to importation. The imported materials may or may not have been "second-hand or waste or refuse," or "obsolete, defective or damaged" and "fit only to be remanufactured." We are not at liberty to "supply from our imagination what should have been established by competent proof."

With reference to the second requirement of section 1(b) of Public Law 81–869 that the merchandise be "fit only to be remanufactured," the laboratory analysis relating to every contested entry clearly establishes that the merchandise as imported met the chemical specifications for aluminum for use in the manufacture of iron and steel. This, in our judgment, necessarily shows noncompliance with the requirement that the merchandise be "fit only to be remanufactured."

We have considered appellants' contentions and authorities cited in support thereof. We are, however, not persuaded of reversible error in the judgment of the Customs Court overruling the six protests in issue. The judgment of the Customs Court is *affirmed*.